*Willis Smith,* for plaintiffs in error. *Boykin & Boykin,* contra.

## 24712. FOX *v.* VON KAMP.

DECIDED MARCH 4, 1936.

*Cumming & Harper, Lee, Congdon & Fulcher,* for plaintiff in error.

*Hammond, Kennedy & Kennedy,* contra.

MACINTYRE, J. Miss Camilla Von Kamp brought an action against Mrs. Mary Harrison Fox, to recover $500 alleged to be due to the plaintiff on a sale of certain real estate belonging to the defendant. A jury rendered a verdict in favor of the plaintiff for $500. The defendant excepted to the refusal of a new trial. The gist of the case made in the petition is that Mrs. Fox through her duly authorized agent, Reginald Dales, "listed" her house and lot with the plaintiff, a duly licensed real estate agent, to be sold

for $10,000 on a commission of five per cent.; that the plaintiff procured as a prospective customer a Mr. J. B. Barrentine, who "had about decided to purchase said property" at said price, when Blanchard & Calhoun Realty Company interfered and made the sale itself by offering to dispose of Barrentine's house and lot for $3500, without charging him anything for so doing; that "said offer constituted an offer to reduce the net price;" that on May 22, 1934, and before the actual consummation of the sale, the plaintiff notified the defendant that the plaintiff was the procuring cause of the sale, and would hold the defendant liable for commissions thereon; that "on May 25, 1934, the plaintiff further advised the defendant" that said realty company "was making the concession aforesaid, which constituted a reduction in price;" that "said sale was made through the Blanchard & Calhoun Realty Company, and the property was purchased through said company only because of their express agreement to sell his [Barrentine's] property without cost to him;" and that, "realizing that . . plaintiff had claim against . . defendant for her services," the defendant "required of . . Blanchard & Calhoun Realty Company a contract to idemnify her against said claim."

The main features of the defendant's answer are as follows: She denied that Dales "was the agent of the defendant for the purpose of securing a real estate agent to procure a purchaser for said property;" denied that she "listed said property with plaintiff" to be sold for $10,000 for a consideration of five per cent. commissions; denied that Blanchard & Calhoun Realty Company was her agent, and averred that it was only the agent of J. B. Barrentine, the prospective purchaser; averred, in substance, that she had accepted the offer of said realty company before she had been advised that the plaintiff was connected with the transaction; denied that she "authorized any person to sell the property for $10,000," but averred that "she herself said she would consider an offer the equivalent of . . $10,000, viz., part cash, balance on time, secured by purchase-money mortgage;" and admitted that "she was aware of the fact that . . plaintiff was advancing some pretended claim for services rendered, and, in view of this, she required of Blanchard & Calhoun Realty Company an agreement to protect her from double commissions, but denied that thereby she recognized or admitted that . . plaintiff had any valid, lawful claim upon her for commissions, or otherwise."

We think that we have fairly stated the main issues presented by the pleadings. Some additional light may be thrown upon the contentions of the parties from the evidence and our discussion of it. Testifying in her own behalf, Miss Von Kamp made out substantially the following case: She was a licensed real estate dealer. Mrs. Fox owned a house and lot located at 2223 Kings Way, Augusta, Georgia. The plaintiff and Mr. Reginald Dales had offices in the same building in Augusta. Dales "represents Mrs. Fox here and looks after her property, and posts property belonging to Mrs. Fox for rent and sale. The signs read 'R. M. Dales, Agent.' . . He asked me to list for sale the property . . at 2223 Kings Way. He told me to submit an offer." Without communicating with Mrs. Fox, and without getting any price or terms, the plaintiff immediately set about getting a purchaser. She showed Mr. and Mrs. Barrentine through the house, and Mrs. Barrentine said that "it answered their requirements and . . was the house that she wanted. Mr. Barrentine asked if any property would be taken in exchange as part payment. I told him that I would have to ask Mr. Dales." Mr. Dales said that "he would recommend the house on Wingfield Street as part payment on the value of $3500, and the next day Mrs. Barrentine 'phoned and said Mr. Barrentine wished to make an offer of $6500 cash, and trade in the house on Wingfield Street as part payment on the value of $3500, making a total of $10,000. I submitted that to Mr. Dales on March 7, 1934." Dales telegraphed said offer to Mrs. Fox at Ventnor, New Jersey. Mrs. Fox wired Dales for fuller information in regard to the house on Wingfield Street, and for the "assessed valuation" of both houses. "The proposition that was made was to value the Kings Way house at $10,000, to credit $3500 for the Wingfield Street house, and pay a cash difference of $6500. Mrs. Fox refused the offer, but . . wired back that she would accept $6500 cash and carry a mortgage of $3500, making a total of $10,000. About March 8 or 9, I took that up with Mr. and Mrs. Barrentine, . . and Mr. Barrentine said she [Mrs. Barrentine] was the one to make the choice; that if she wanted it, that would be the house they would have. The base price agreed on by everybody was $10,000." Mrs. Barrentine said "they would like to sell some property that they already owned before taking on more. . . She said that they had $10,000 . .

and could pay the whole amount in cash, but they simply preferred to get rid of some property . . they were already holding. However, negotiations were under way for the sale of this property in Macon, and as soon as the sale was consummated they would buy the Kings Way house for $10,000 cash." About seven weeks after the offer was made "the middle . . of the third week in April," Mrs. Barrentine 'phoned the plaintiff that "as soon as Mr. Barrentine returned to the city they would get in touch with me to see about purchasing the house for $10,000 cash." Two days later Mr. Dales told the plaintiff that the Barrentines "should not delay, because another offer had been made to Mrs. Fox by another agent, the same offer which I had first submitted. . ." The plaintiff immediately explained the situation, as stated by Mr. Dales, to Mrs. Barrentine, and she said that "the offer was made by another agent." The plaintiff immediately notified Mr. Dales that Barrentine was her prospect, and on May 7 notified him in writing, which was transmitted to Mrs. Fox. On May 22 the plaintiff wrote Mrs. Fox that Dales had "listed" for sale with plaintiff her house and lot at 2223 Kings Way upon a five per cent. commission basis; that she interested Mr. and Mrs. Barrentine in the property, and "they have agreed to purchase it, and have entered into a contract of purchase;" that she had performed all services required of her and had earned her commission of five per cent. on "the purchase price of $10,000;" and that she was enclosing her bill for $500. To this letter she received no reply. On May 26 the plaintiff wrote to Mrs. Fox another letter to the effect that Blanchard & Calhoun Realty Company was interfering with her prospect by agreeing to sell Barrentine's house and lot without charging commissions, and that this was illegal and improper and "constitutes a reduction in price," and that if the sale went through she expected to institute suit on her claim. Mrs. Fox did not reply to this letter. "The property was sold May 21st." On cross-examination the plaintiff testified in part as follows: "In my letter to Mrs. Fox I said, 'as a result of having shown the property to them they have agreed to purchase it, and have entered into a contract of purchase.' I did not mean that they had entered into any contract of purchase through me; it was through the other agent. I was able to get the Barrentines to offer $10,000 for this property, or to meet Mrs. Fox's terms,

that . . he would pay $10,000 for the property when he disposed of the property in Macon, and it was at this time when this interfering came. . . They yielded to Blanchard & Calhoun's persuasions because they were told that if they paid $10,000 and would buy through them, Blanchard & Calhoun would guarantee to sell their house . . without charging a sales commission. Mrs. Barrentine said if I would agree to do the same thing she would buy through me. I told her I couldn't, because it was unethical, contrary to the rules of the real estate board, and one reason for which my license could be revoked. I was not able to offer the Barrentines the inducements which Blanchard & Calhoun rightfully or wrongfully did offer them. I couldn't offer to sell their house without charging a sales commission; no, I wouldn't do it. The Barrentines agreed to buy the house for $10,000 until this interference. . . Yes, it was only verbal . . and it was conditioned that they would buy when they sold certain Macon property. . . They sold the Macon property and she 'phoned me that as soon as Mr. Barrentine came back to town they would buy and pay cash. They didn't do it, on account of this interference. I wasn't able under those conditions to get them to enter into a contract with Mrs. Fox through me to take this property at $10,000."

George B. Blanchard testified that he was president of Blanchard & Calhoun Realty Company, a corporation engaged in buying and selling real estate; that said company's agent, Mr. Hutto, came to the witness with the Barrentine offer on April 30, 1934, said offer being $6500 cash and the Wingfield Street property at a valuation of $3500; that witness submitted this offer to Mrs. Fox by wire on May 10; that Mrs. Fox telegraphed from Atlantic City, New Jersey, that she would not accept the offer, but would consider $10,500 cash, or $8000 cash and mortgage for $3000, and that Miss Von Kamp was claiming commissions, and Mrs. Fox must have a written agreement protecting her from "double commission;" that Mr. Barrentine refused the offer, "declined to make any counter proposition, and was not interested further in the matter at that time;" that the witness and Mr. Hutto went into the matter fully, ascertained that $3500 was an abnormally low valuation on Barrentine's house and lot, and induced Mr. Barrentine to keep his house and make an offer of $10,000 gross for

Mrs. Fox's property; that this was the first time "we were able to get an offer approximating what she [Mrs. Fox] wanted for the house;" that the witness then had to persuade Mrs. Fox to accept said offer, and on May 17, 1934, wired her at Ventnor, Atlantic City, New Jersey, that he had a cash offer of $9500 net to her for her property, which he strongly recommended that she accept, and that she would not have to pay any commission. On May 21, 1934, Mrs. Fox wired Blanchard & Calhoun Realty Company, accepting said offer and insisting that she be protected as to commissions. On the same day the witness wired Mrs. Fox that Mr. J. B. Barrentine "accepts your offer." This witness further testified that "we undertook to sell for him this property that he wanted to trade in. We did not guarantee a sale of it. I did not undertake to sell it without charging commission, . . and in order that a commission might be earned we put it at $3700. . . After we made the first offer of Mr. Barrentine, which was declined by Mrs. Fox, and she came back with a counter-proposition of $10,500, Mr. Barrentine was firmly decided not to buy this property on Kings Way. . . Then he immediately started repairing his house, and stated it was for the purpose of staying there, and eliminated the question of any further interest in any other house. He was painting the house and doing over the walls and fixing the floors, and doing a general improving over the property. The facts are . . at that time, which was . . about the 11th of May, 1934, he was not interested further in the Kings Way house. This interest was revived in Barrentine some days later, . . our idea being that this house should sell then quickly for $3500, and that our job was to sell the Kings Way house rather than undertake to get Mrs. Fox to take it as part payment on the Kings Way house. . . Mrs. Fox requested me to come to her home some eighteen months ago; she wanted to sell her place and asked me at the time to work out a plan of sale for her. . . Continuously, during her ownership of this property, we have been in communication with her at intervals. In fact, in January, 1934, we almost had a sale of her house to an entirely different client—the Kings Way house. . . We did not know Mr. Barrentine was in the market. He approached us to work this trouble out for him. . . We did not know Miss Von Kamp was in this picture until Mrs. Fox wired us in answer to our offer

submitted by Mr. Barrentine. This is the first information we had that she was connected with the sale."

Reginald Dales testified: "I am employed by Mrs. Fox to collect rents, look after the physical property, and pay taxes, and things like that. . . Those duties are just what I have done in the past from time to time. . . I would find a buyer and submit a proposition to Mrs. Fox. That I did myself, not through . . any real estate agent. She had not ever authorized me to employ a real estate agent for her and in her behalf. . . I asked her [Miss Von Kamp] why she did not help Mrs. Fox dispose of her property 2223 Kings Way, and she said that she would see if she couldn't get a prospect and make a proposition. . . That was all that occurred. I had not been authorized by Mrs. Fox to employ Miss Von Kamp or any other real estate agent for her. I did not put a price on the property. . . I haven't that authority. After that I acted as an intermediary between Miss Von Kamp and Mrs. Fox. . . I had no other connection with the business. I was not clothed with any direction as to price, terms of sale, or anything of that kind." On cross-examination Dales testified; "Mrs. Fox instructed me to help her sell this place on Kings Way. I had sold other property for her; just small negro houses, some of it through real estate agents. With the direction that Mrs. Fox had given me, I took the matter up with Miss Von Kamp. I knew the business she was in, and that she expected to be compensated for her work. I requested Miss Von Kamp's aid on no authority from Mrs. Fox, but because she had instructed me to assist her in selling the property. . . I did not communicate with Mrs. Fox with reference to the efforts that were being made to sell it. I received the letter of May 7, and transmitted it to Mrs. Fox. . . When Blanchard & Calhoun came into the picture, and some question arose with reference to Miss Von Kamp's commission, I communicated with Mrs. Fox by letter."

L. M. Hutto testified: "I am salesman for Blanchard & Calhoun Realty Company. . . I was standing in front of the Marion Building, and Mr. Barrentine approached me . . and the question of property came [up]; and he said, 'I will give $6500 and a house and lot on Wingfield Street for a place I know up in Kings Way.' I said, 'Let me make the offer.' He said, 'All right.' . . Well, they turned it down and wouldn't accept it. I went

to see Mr. Barrentine. He said, 'Well, I won't take it; I am through.' I made several trips to his house and talked to him and his wife. . . I went up to his house one time, and he was remodeling his home, . . and he said 'We have decided we are going to keep this place and not trade.' I tried to get a cash offer from him, and he wouldn't make one. . . I said to Mr. Barrentine: 'Why don't you keep your home there and make a cash offer?' He said: 'Well, I don't think I will do that.' We kept after him continually. . . It looked like after a while he got interested again. . . And I talked to his wife several times, and there was a house on Kings Way that belonged to Mrs. Maxwell, and she didn't like that. I showed him the Bradshaw home . . and the Levy home. . . At that time Mr. Barrentine wanted to swap. That was holding up the trade, . . and he said: 'If I don't get rid of this home I am not going to swap.' . . I said: 'Why don't you go ahead and make a cash offer for that place on Kings Way? Your wife wants it . . bad, and she ought to have it.' He said: 'Well, I want to look at that place. Let me look at it good;' and . . we went to see it, and he said: 'Well, will you submit an offer of $10,000 cash.' . . I was in touch with Mr. Barrentine . . about six weeks, I guess. . . It was a cash proposition."

J. B. Barrentine testified: "As a matter of fact, the sale was not made . . through Miss Von Kamp. I met Mr. Hutto on the street . . and he asked me if I was in the market for any real estate, and . . I told him about the trade we were anticipating through Miss Von Kamp, but it fell through; and he asked me to let him submit the proposition to Mrs. Fox, which he did. The offer that I made was not satisfactory, and of course we just dropped the thing from my mind and began to repair the house we were in, the Wingfield Street property, and decided to stay on there, and not to buy. We had abandoned any thought of buying through Miss Von Kamp, or anybody, until the matter was submitted again by Mr. Hutto. Well, he submitted this proposition that I made to him to Mrs. Fox. It was the same proposition, . . and of course she didn't want to accept no property in exchange. She wanted cash for the property, and I didn't want to buy and have this same house on my hands too, and Mr. Hutto obligated to sell the house if I would pay cash for the Fox property,

and my wife and I . . decided we would buy it for cash if Mr. Hutto . . would sell the Wingfield Street house. My mind was brought to paying that $10,000 cash because of the facts and arguments presented to me by Blanchard & Calhoun. I was not endeavoring to sell property in Macon. We had a little property at Gordon, . . but that didn't amount to anything. . . That didn't cut any ice in the picture. It was Mr. Hutto who finally sold me the property." On cross-examination Barrentine testified: "When I looked at the house with my wife and Miss Von Kamp, I concluded that I was willing to pay $10,000 in money and money's worth. I valued my house at $3500, and wanted to dispose of that house. . . No price had been put on the property when Miss Von Kamp showed it to me. . . My wife was the one to be pleased. . . As long as I could please her, and not get the worst of the bargain, I was out to . . please her. . . I referred the dealings with Miss Von Kamp to my wife and most of the conversations were between them. . . I explained that I had to sell my house on Wingfield Street before I would buy this one. Mr. Hutto obligated . . to sell it for me, and to get me $3500 net. . . Some two or three months had elapsed from the time Miss Von Kamp had been trying, but I don't know what had been going on between Miss Von Kamp and my wife in the interval. I finally paid $10,000 for the Kings Way property. Sure, I had a contract with Mr. Hutto to sell my house for $3500, and I went ahead and bought the property, believing that Blanchard & Calhoun would make good their contract. . . Well, that caused the sale."

Mrs. J. B. Barrentine testified: "We . . had been looking for a large house for a long time, and we wanted to exchange the one we had for a larger one. . . I told her [Miss Von Kamp] we would like to trade our house for a larger one. That was . . about November, 1933. She said she would let me know when she found something. Then she called me . . after Christmas, and said she thought she had one I would like. . . That was the house on Kings Way, formerly the house of Mrs. Fox. Mr. Barrentine and I met her, and we looked at the house. . . Well, she got in touch with Mrs. Fox, and said Mrs. Fox would not consider a trade at all. I believe she said she might . . take $10,000 cash, and I told her that we could not pay $10,000 cash,

and we would have to wait until we could trade ours, or until we sold ours. That last conversation was in . . January. I don't think I had any further conversation with Miss Von Kamp until after Mr. Hutto got in. . . I told her that Mr. Hutto was trying to sell it to Mr. Barrentine. . . She said our house was easily worth $3500, and I told her if she would take it we would buy the house. She said she couldn't do that. So it rocked along, and we were looking at other houses. . . Mr. Hutto and Mr. Barrentine were looking at houses. . . I reckon the negotiations with Miss Von Kamp in reference to the Fox house had terminated. We had just dismissed it from our minds. . . I went ahead and had my house done over inside, and we decided we would not get another house, and then our notion changed. The boys came home in the spring and we decided we would trade for a larger house, and then we went on looking for another one. I didn't have any trade with . . Blanchard & Calhoun. . . Mr. Barrentine did that. . . I tried to get Mr. Barrentine in the notion of buying it [Mrs. Fox's house]. I wanted it all the time, but you see he was the one. I didn't do anything further with Miss Von Kamp. I left it with Mr. Barrentine, and Mr. Hutto had told him that he would sell his house. Miss Von Kamp said that she wouldn't undertake that. . . The thing that diverted me and Mr. Barrentine from the purchase from Miss Von Kamp was the agreement of Blanchard & Calhoun to dispose of our house at $3500 net to me; I guess so. And then, another thing, we just got in another notion of buying a house. . . I never had seen the house with a view of purchasing it before Miss Von Kamp showed it to me. I saw the house and wanted it. . . I had to work on Mr. Barrentine to get him in the notion. I was trying to talk him into it. . . He didn't want to, to begin with. He was finally willing to do that. I didn't want to sell our house. . . I had rather have kept it, . . but I had to talk him . . in the notion and strike while the iron was hot. We thought at first we wouldn't pay $10,000 for it. . . But we did after we finally saw we could sell our house. After we knew that we could sell our house for $3500, we were willing then to pay $10,000. . . I was interested in it [Mrs. Fox's house] when I looked at it, but . . I had just given it up and decided that we wouldn't buy it. . . No, Miss Von Kamp didn't sell

this house to me. Blanchard & Calhoun sold it to Mr. Barrentine, who had the money to pay for the house. . . Miss Von Kamp would not undertake to reassure me about selling that $3500 house. . . We didn't then consider ourselves able to finance the purchase of the Fox house, and we dropped it, and through her tried to find another place. Afterwards my husband took the matter of the purchase through Blanchard & Calhoun. They made such representations and such inducements that Mr. Barrentine was induced to make the $10,000 offer."

Mrs. Mary Harrison Fox testified, in effect, that on about March 4 or 5, 1934, she received a telegram from Mr. Dales, asking if she would consider a house and $6500 for her Kings Way property; that "my business connection with Mr. Dales is merely that of employer and employee, and he receives a fixed salary for collecting my rents and looking after the repairs of my properties, but I never in any way authorized him to sell my property nor asked him to list it for sale with any real estate agent;" that she did not know from whom the offer was coming; that on March 6, 1934, she wired Dales for further information about the property offered as part payment for her house; that on the same day Dales gave the information requested; that on March 7, 1934, she declined the offer, and said she would consider $6500 cash, with $3500 mortgage on it; that no sale was consummated; that she afterwards sold her property to J. B. Barrentine, who accepted her offer on May 21, 1934; that on May 17, 1934, George C. Blanchard wired her a cash offer of $9500 net for her house; that "my final telegram to Mr. Blanchard was that I would accept $10,000 cash offer;" that after her telegram of March 7, 1934, to Dales, she "never heard another thing from him nor of the original offer;" that she did not know that Miss Von Kamp was in any way connected with the offer; that she "believed that the tentative negotiations made in the early part of March had come to nothing;" that Dales "was not authorized to list this property for sale with a real estate agent and contract to pay a commission of five per cent. . . to the selling agent;" that she received the two letters of May 22, and May 25, 1934, from Miss Von Kamp, wherein she wrote that Blanchard & Calhoun Realty Company had interfered with her sale by agreeing to sell Mr. Barrentine's house for $3500 without commissions, that she (Miss Von Kamp) was the procur-

ing cause of the sale, if one was made, and that she would demand her commissions. Mrs. Fox testified, that, after receiving Miss Von Kamp's threatening letters, she asked Blanchard & Calhoun Realty Company to assure her that Miss Von Kamp had no claim and that she would not have to pay a second commission; and that said company gave her that assurance by letter and telegram.

Reginald Dales, recalled, testified that his letter of March 9, 1934, gave Mrs. Fox the first information that Miss Von Kamp "was the agent handling the matter;" that on May 8, 1934, he wrote to Mrs. Fox that "it seems that Blanchard & Calhoun are trying to sell to Mr. Barrentine, who is the same party who made you the proposition outlined in Camilla's letter," and, "if this is true, Mr. Barrentine is Camilla's prospect . . and entitled to full commission," and "would advise you to deal direct with Camilla so that you can avoid paying double commission;" that he received no response to that letter; and that witness "never advised Mrs. Fox that Miss Von Kamp had been employed as an agent to represent her." The witness concluded his testimony as follows: "Mrs. Fox has never put a price on any of her property. She did not put any price on this particular property. Miss Von Kamp was to undertake to procure a prospect and submit the proposition to Mrs. Fox, to reject or accept as she saw fit. That is what Mrs. Fox did do. The proposition for a trade-in of the house and the payment of $6500 in cash went up to a certain point. That was rejected."

Recalled, Miss Von Kamp testified: "Mrs. Barrentine told me . . . when they disposed of this property in Macon they would buy 2223 Kings Way for $10,000 cash. . . She told me over the telephone one day that they had disposed of the property in Macon. She said Mr. Barrentine was out of town, and as soon as he returned she would get in touch with me; that they were ready to purchase the Kings Way property. It was about two days later that Mr. Dales told me another agent was making an offer on the property. . . Mrs. Barrentine told me that if I would make the same inducement of selling her bungalow without any commission, they would purchase through me; if not, it was their interest to purchase from the agent offering the best inducement. . . The Barrentines told me they would make the cash offer until this interference." The following cross-examination con-

cluded Miss Von Kamp's testimony: Q. "I understand that, but as a matter of fact they never did make the cash offer to you." A. "Yes, they made a cash offer to me if I told them I would make the sale of the bungalow without commission." Q. "And you weren't willing to do that?" A. "No, sir, because it was unethical." Q. "Regardless of whether it was right or wrong, but the fact is that you did not do what Blanchard & Calhoun did, but Blanchard & Calhoun did do it and induced them to make a cash offer?" A. "I could have, but I didn't." Q. "You could have, but you didn't?" A. "That is correct." Q. "Not only you didn't, but you wouldn't do it?" A. "I didn't." Q. "And you wouldn't do it?" A. "I couldn't do it." Q. "And these gentlemen would and did?" A. "That is right." Q. "And therefore they are the ones able to present an offer?" A. "That is right."

The letters to which reference has been made were introduced in evidence. We are very much inclined to the opinion that Dales was without authority to "list" Mrs. Fox's property with Miss Von Kamp, to be sold for any particular sum on commission. The fact appears to be that he did not. But be this as it may, it is certain that Mr. Barrentine positively declined to pay $6500 cash for the property and give a mortgage on it for the balance of $3500; and this appears to have been the only definite price and terms indicated by Mrs. Fox, directly or otherwise, to Miss Von Kamp. It is true that Miss Von Kamp contends that Mr. Barrentine did offer to purchase for $10,000 cash after he had sold some property in Macon. Mr. Barrentine says that he knew nothing of this alleged conditional offer, and that the sale of the Macon property did not enter into the matter. But even if he was in error, Mrs. Fox's offer was not to sell for $10,000 cash, but for $6500 cash, with balance of $3500 secured by a mortgage. We do not understand that Mrs. Fox would have been legally bound to accept $10,000 in cash from Barrentine, even if the Blanchard & Calhoun Realty Company had not "interfered." Neither do we think that Mrs. Fox ever acceded to the alleged conditional proposition to buy her property. It is certain that the Blanchard & Calhoun Realty Company finally effected the sale by promising Barrentine to sell his property, a promise which Miss Von Kamp would not make. Our view is, that, under the evidence in this

case, the Blanchard & Calhoun Realty Company, and not Miss Von Kamp, was, as a matter of law, the procuring cause of the sale. See Code of 1933, § 4-213. We therefore hold that the judge erred in overruling the general grounds of the motion for new trial. The first five special grounds are merely elaborations of the general grounds. The next five grounds have reference to excerpts from the charge to the jury, most of them complaining that the excerpt in question was not adjusted to the facts of the case, and expressed an opinion of the court as to what had been proved. Considering these excerpts in connection with their context, and in the light of the charge as a whole, we do not think any of them warrants a reversal. The last ground avers that the court erred in admitting in evidence a letter written by Reginald Dales to Mrs. Fox on May 8, 1934. This letter reads: "It seems that Blanchard & Calhoun are trying to sell to Mr. Barrentine, who is the same party who made you the proposition outlined in Camilla's letter. If this is true, Mr. Barrentine is Camilla's prospect; and accordingly Camilla is entitled to full commission, although you trade with Blanchard & Calhoun. Therefore would advise you to deal direct with Camilla, so that you can avoid paying double commission." The defendant objected upon the ground that "the evidence was irrelevant and incompetent and a conclusion of the witness on a question of law." The court instructed the jury, in effect, that those parts of the letter expressing the opinion of the writer upon the facts and the law were incompetent and should not be considered, and that "it is admitted solely and only for the purpose of showing, or tending to show, if it does, that Mrs. Fox knew . . that Miss Von Kamp had been active in the sale of the property." We hold that the court did not err in admitting the evidence solely for the purpose stated by him. The judgment is reversed solely because of the court's error in overruling the general grounds of the motion for a new trial.

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*